STATE OF INDIANA, EX REL. BINGHAM, ATTORNEY-GENERAL, *v.* THE HOME BREWING COMPANY OF INDIANAPOLIS.

[No. 21,689. Filed June 23, 1914.]

1. COMMON LAW.—*Extent of Adoption.*—The common law of this State exists by virtue of legislative adoption, and consists of the common law of England and English statutes of a general nature and not local to that kingdom, in aid thereof, as it was prior to the fourth year of the reign of James I, with certain named exceptions and when not inconsistent with the State or Federal Constitutions, or statutes. p. 79.

2. QUO WARRANTO.—*Common Law.*—*Statutes.*—The ancient practice of exhibiting information in the nature of *quo warranto* by the Attorney-General in his own name, and as later modified by Stats. 4 and 5, William and Mary, Chap. 18, and by Stat. 9, Anne, Chap. 20, is no part of the common law of Indiana. p. 80.

3. QUO WARRANTO.—*Statutory Provisions.*—The common-law remedies of the Attorney-General, and the practice and proceedings in filing informations in the nature of *quo warranto*, have been made the subject of special legislation in this State (§§1188-1203 Burns 1914, §§1131-1146 R. S. 1881), which provides a definite, comprehensive and sufficient method of enforcing the remedies, and especially of the remedy to procure a forfeiture of a corporate franchise. p. 81.

4. QUO WARRANTO.—*Forfeiture of Corporate Franchise.*—*Statutes.*—The remedy provided by statute (§1188 *et seq.* Burns 1914, §1131 *et seq.* R. S. 1881), for the forfeiture of corporate franchises takes the place of the proceeding at common law, and is exclusive in all the particulars of remedy and procedure which it covers, and while doubtless the common law might be looked

to if matters essential to the remedy were in any respect absent from the statute, the judicial history of the State has established the practice of looking to the civil code, where details in procedure are lacking.  p. 81.

5.  QUO WARRANTO.—*Parties Entitled to Bring Proceeding.*—*Statutes.*—Under §1188 Burns 1914, §1131 R. S. 1881, providing for the filing of information in *quo warranto*, together with §1189 Burns 1914, §1132 R. S. 1881, providing that the information may be filed by the prosecuting attorney upon his own relation when he shall deem it his duty to do so or be directed by the court or other competent authority, or by any other person on his own relation when he claims an interest in the office, franchise, or corporation which is the subject of information, an information against a corporation for the forfeiture of its franchise must be filed by the prosecuting attorney, since the cause for the proceeding in such instance is a matter wholly involving the public interest, and §1189 must be construed as authorizing the institution of proceedings in *quo warranto* by persons other than the prosecuting attorney only in instances where the informant has an interest in the subject-matter personal to himself and distinct from that of the public generally.  p. 84.

6.  QUO WARRANTO.—*Parties Entitled to Bring Proceedings.*—*Attorney-General.*—The office of Attorney-General in this State is purely of statutory origin, the powers and duties of which are limited to those set forth in the act creating the office (Acts 1855 p. 16) and the amendatory and supplemental acts thereafter passed, and which are now embraced in the comprehensive act of 1889 (Acts 1889 p. 124, §§9266-9269 Burns 1914), and to duties expressly conferred by statute in a few other instances, and, being a statutory officer subject to the rule of delegated power, the Attorney-General has no common-law power to institute *quo warranto* proceedings.  pp. 87, 93.

7.  CONSTITUTIONAL LAW.—*Distribution of Powers.*—*Administrative Officers.*—Under the Constitution the courts are endowed with plenary judicial power, and the authority of the legislative department is subject only to the constitutional limitations, but no comprehensive powers are granted by the Constitution to administrative officers, and it is the policy of the State that such officers have only such powers as are expressly delegated.  p. 90.

8.  QUO WARRANTO.—*Parties Entitled to Bring Proceedings.*—*Attorney-General.*—In view of the fact that §9720 Burns 1914, Acts 1899 p. 219, providing that the Attorney-General shall prosecute all civil actions brought in the name of the State or in the name of the State on the relation of the Attorney-General, provides that nothing therein shall be taken to affect the authority given by law to prosecuting attorneys to prosecute civil actions,

and in view of the long continued legislative policy to place exclusive authority in prosecuting attorneys to prosecute informations in *quo warranto* in cases involving public interest only, §9720 can not be construed as conferring upon the Attorney-General any of the authority in such matter conferred upon the prosecuting attorneys by §1189 Burns 1914, §1131 R. S. 1881. pp. 95, 96.

9. STATUTES. — *Construction.* — *Provisos.* — While the office of a proviso in a statute is generally to. except something from the enacting clause, or to qualify or restrain its generality, its purpose may be to exclude some possible ground of misinterpretation of the body of the section or act, as extending to it cases not intended by the legislature to be brought within its purview. p. 96.

10. WORDS AND PHRASES.—"*To Affect*".—"*Authority*".—"To affect" is to have effect on, to touch, influence, or modify; "authority" means control over, jurisdiction, absolute power. p. 97.

From Superior Court of Marion County (76,123); *Pliny W. Bartholomew,* Judge.

Information in *quo warranto* by the State of Indiana, on the relation of James Bingham, Attorney-General, against the Home Brewing Company of Indianapolis. From a judgment for defendant, the relator appeals. *Affirmed.*

*James Bingham, William H. Thompson, Edward M. White* and *Alexander G. Cavins,* for appellant.

*Henry Warrum,* for appellee.

Cox, C. J.—This was an information in one paragraph in the nature of *quo warranto* brought on the relation of the Attorney-General against appellee, a manufacturing corporation engaged in the brewing business. The information alleges that the appellee has persistently and openly abused and exceeded its corporate powers for ten years, (1) by engaging in the real estate business and owning real estate other than that necessary for its business; (2) by loaning money, advancing money to pay retail liquor license fees and defraying expenses incidental to the issuance of retail liquor licenses; (3) by acting as surety on liquor license bonds; (4) by owning, holding and leasing saloon fixtures for the purpose of fitting up and operating retail liquor

saloons in Indiana; (5) by owning, operating, maintaining and conducting retail liquor saloons; (6) by violating a large number of criminal statutes of this State, selling to minors, to intoxicated persons and on Sundays, running gambling rooms, houses of assignation and prostitution and blind tigers and by selling intoxicating liquors directly to consumers, etc.; (7) by entering into unlawful conspiracies, undertakings and combinations to monopolize the business of selling beer and other intoxicating liquors; and (8) by violating the act approved March 11, 1907, commonly called the antitrust law; that appellee has done all of these acts continually within the State of Indiana and claims the right to do them under its charter. A temporary injunction, judgment to dissolve the corporation and the appointment of a receiver to wind up its affairs are prayed for.

Appellee demurred to the information on the following grounds: (1) That the court had no jurisdiction over the subject-matter of the action; (2) that the plaintiff had no legal capacity to sue; (3) that there was a defect of party plaintiff in that the Attorney-General was not a proper relator in said proceeding, but that the proper relator was the prosecuting attorney; and (4) that the complaint did not state facts sufficient to constitute a cause of action. This demurrer was sustained by the court over appellant's exception, and appellant refused to plead further and elected to abide by the sufficiency of its complaint. Judgment was rendered for appellee and against appellant and that appellant take nothing by its complaint and information. From this judgment this appeal is brought and the ruling on demurrer is presented for review by proper assignment of error. If any one of the grounds stated in the demurrer is valid the ruling of the lower court must be sustained and the judgment affirmed.

The foundation upon which the complaint must primarily rest is the authority of the Attorney-General as relator to exhibit an information in *quo warranto* to forfeit corpora-

tion charters. The ruling of the trial court, we are informed by briefs of counsel, was predicated on such lack of authority in the Attorney-General in this State. The position of appellant on this question is thus stated in the Attorney-General's brief: "Appellant claims that the Attorney-General is a proper relator and has the power to exhibit information in the nature of *quo warranto,* first, by reason of his inherent power as a common law officer, and, second, by virtue of the statutes of this State relating thereto". The first contention of the Attorney-General so stated has its foundation on a theory that the action before us is of common-law origin, and governed by the common-law rules with respect to the relator; that the office of Attorney-General in this State being one known to the common law is endowed with all the authority with which the common law invested it; that, as there was lodged with the Attorney-General at common law, as the chief law officer of the crown, authority to exhibit such informations, this common-law power follows and attaches itself to the office of Attorney-General in this State, by reason of the name of the office.

The common law of this State as it has always existed here by legislative adoption is the common law of England and English statutes of a general nature and not local 1. to that kingdom, in aid thereof, as it was prior to the fourth year of the reign of James I (1607), with certain named exceptions and when not inconsistent with our State or Federal Constitutions, or statutes. It was first so adopted from Virginia by the governor and judges of the Northwest Territory and has since been so declared by subsequent legislative bodies of the State. Laws of the Northwest Territory, 1795 (Reprint) p. 190; Revised Laws (Ter.) 1807 p. 139; Laws 1818 (2d Session, State) p. 308; R. S. 1824 p. 256; R. S. 1831 p. 330; R. S. 1838 p. 398; R. S. 1843 p. 1030; 1 R. S. 1852 p. 351; §236 R. S. 1881; §236 Burns 1914. But this provision of our law has not had the effect of making English statutes, passed subsequent to

1607. a part of the body of our law. *Holloway* v. *Porter*
(1874), 46 Ind. 62. The law and practice of infor-
2.  mations in the nature of *quo warranto* were not as
comprehensive under the common law of that time
as that embodied in our statutes on the subject as they are
now and have been at least as far back as 1843. R. S. 1843
p. 935; §§1188-1203 Burns 1914, §§1131-1146 R. S. 1881.
When the ancient writ of *quo warranto* was supplanted in
English practice by informations in the nature of *quo war-
ranto*, these informations were filed and exhibited by, and
in the name of, the Attorney-General. They were not
brought in the name of the crown, on the relation of the
Attorney-General but were filed by the officer in his own
name. These were proceedings of a public nature involv-
ing public, or crown rights. Gradually the practice de-
veloped of allowing the master of the crown office (a differ-
ent law officer, head of the Department of Justice of the
King's Bench Division), to exhibit information in the nature
of *quo warranto* on the relation of private individuals to
enforce certain of their rights in offices, franchises and the
like. These actions were brought by the master of the
crown office in his own name, on the relation of the private
individual. The vexatious and irresponsible character of
this litigation led to the enactment of statutes 4 and 5, Will-
iam and Mary, chapter 18, which required the private indi-
vidual to enter into a recognizance in the sum of twenty
pounds and obtain leave of the court before he could re-
quire the master of the crown office to file such an informa-
tion on his relation. As this statute was enacted long after
1607 it is no part of the common law of Indiana. There-
after, the practice in filing such informations on private re-
lation was covered by the statute 9 Anne, chapter 20, enacted
in 1711. This statute is no part of the common law of In-
diana, although it may doubtless have suggested our statute,
and the information statutes of other states; but our statute
goes further and covers the entire field embracing those

public causes which the common law entrusted to the Attorney-General as well as the suits of a private interest which the statute of 9 Anne covered. That part of the law of England concerning informations in the nature of *quo warranto* which prevailed at the date of the settlement of Virginia does not contain any discoverable act of parliament, certainly not the statutes of William and Mary, or of Queen Anne. And the practice concerning this extraordinary remedy which existed in 1607 amounted to this and no more, the writ having fallen into disuse, the information in the nature of *quo warranto* would lie at common law in the name of the Attorney-General to secure a forfeiture, ouster and fine, in the case of a misuser of corporate franchises.

But in this State the common-law remedies of the Attorney-General in the one instance, or of the master of the crown office in the other, and the practice and the

3. proceedings in filing informations in the nature of *quo warranto,* have been made the subject of special legislation. §§1188-1203 Burns 1914, *supra.* And such legislation provides a definite, comprehensive and sufficient method of enforcing these remedies, and especially of the remedy which the sovereign might seek to exercise against a corporation to secure a forfeiture of its franchise.

4. This is the only statutory method in Indiana for forfeiting charters, or testing the usurpation of corporate franchises, and this statutory remedy takes the place of the common-law proceeding and is exclusive in all of the particulars of remedy and procedure which it covers. If matters of procedure essential to the remedy were in any respect absent from the statute doubtless we might look to the common law to supply the omission. Judge Potter of the state of New York, whose legislation on this remedy has not been unlike that of this State, in his work on corporations says: "In most of the states, the proceedings are authorized and sometimes regulated by statute; where a statute provides

the remedy to test the rights to exercise a franchise or office, it is generally held to be exclusive of all other remedies for that purpose, it being a universally recognized rule, that the sovereignty conferring the franchise may, at any time, in its own appointed way, and forms, inquire into the manner in which the franchise granted is used." 2 Potter, Corporations §665. See, *Palmer* v. *Foley* (1873), 36 Sup. Ct. (N. Y.) 14; *Atchison, etc., R. Co.* v. *People, ex rel.* (1879), 5 Colo. 60, 62; *People, ex rel.* v. *Londoner* (1889), 13 Colo. 303, 304, 22 Pac. 764, 6 L. R. A. 444; *Louisville, etc., R. Co.* v. *State, ex rel.* (1907), 154 Ala. 156, 45 South. 296. The Colorado statute on such informations (Chap. 27, Civil Code 1887 p. 182) is like our own. In *People, ex rel.* v. *Londoner, supra,* the court said: "Chapter 28, Code of Civil Procedure, is a substitute for the original common-law *quo warranto* remedy. It prescribes an enlarged proceeding, substantially by information in the nature of *quo warranto,* and furnishes an exclusive method, so far as district courts are concerned, for investigating usurpations of office." In *Louisville, etc., R. Co.* v. *State, ex rel., supra,* it was said: "Whatever may have been the common law * * * our statutory system in respect to *quo warranto* proceedings has supplanted the common law and constitutes the only system of laws now obtaining in this state touching the remedy of *quo warranto,* or information in the nature of *quo warranto;* and a *quo warranto* proceeding which does not meet the statutory requirements as to parties and practice can not be maintained."

It was early recognized by this court that our code provisions relating to informations in the nature of *quo warranto* displaced, so far at least as they went, the common-law remedies. In *Danville, etc., R. Co.* v. *State, ex rel.* (1861), 16 Ind. 456, it was said: "The Code provides that an information may be filed against a corporation where it is not legally organized, and where a corporation does, or omits, acts which amount to a surrender, or a forfeiture, of its

rights and privileges as a corporation, or when it exercises powers not conferred by law.  *  *  *  It thus gives, by information, the redress obtained at common law through *scire facias* and information." · In *Wabash R. Co.* v. *Mc Cormick* (1899), 23 Ind. App. 258, 55 N. E. 251, in discussing the effect of §236 of our code, *supra* (§236 Burns 1914, §236 R. S. 1881), making the common law a part of the law of our State it was said: "Under this act, if there is a statute covering the subject-matter it must control. If the statute on any particular subject is different from the common law on the same subject, the common law is to that extent inconsistent with the statute, and is not in force. Under the code, the rules of the common law do not control in any case where complete provision is made by a statute.  *  *  *  If a statute fails to provide a complete remedy, the common law may be invoked in so far as it is not inconsistent with Federal and State Constitutions and statutes. But if the statute does provide a mode of procedure, it must be followed and obeyed. See, *Sanders* v. *State* [1882], 85 Ind. 318, 44 Am. Rep. 29; *Nealis* v. *Dicks* [1880], 72 Ind. 374; *Cloud* v. *Bruce* [1878], 61 Ind. 171." The judicial history of the State at least as far back as 1843 shows clearly that every action to forfeit corporate franchises has been instituted and prosecuted under statutory provisions and that when that part of the statutes covering the law and procedure of actions in the nature of *quo warranto* was lacking in some detail of procedure the general civil code of procedure and not the common law was looked to for the missing detail. *Reynolds* v. *State, ex rel.* (1878), 61 Ind. 392, 413; *Logan* v. *Vernon, etc., R. Co.* (1883), 90 Ind. 552, 556; *Robertson* v. *State, ex rel.* (1887), 109 Ind. 79, 10 N. E. 582; *Eel River R. Co.* v. *State, ex rel.* (1900), 155 Ind. 433, 57 N. E. 388; *State, ex rel.* v. *French Lick Springs Hotel Co.* (1908), 42 Ind. App. 282, 82 N. E. 801, 85 N. E. 724.

The inquiry then leads to the discovery of whether our

statutory provisions direct how such an action is to be brought, provide who may exhibit the information and who the relator may be. If such provisions are found they must be taken to exclude, in these particulars, inconsistent common-law practices. §1188 Burns 1914, *supra,* provides: "An information may be filed against any person or corporation in the following cases: *First.* When any person shall usurp, intrude into, or unlawfully hold or exercise any public office or any franchise within this state or any office in any corporation created by the authority of this state. *Second.* Whenever any public officer shall have done or suffered any act which, by the provisions of law, shall work a forfeiture of his office. *Third.* Where any association or number of persons shall act within this state, as a corporation, without being legally incorporated. *Fourth.* Or where any corporations do or omit acts which amount to a surrender or forfeiture of their rights and privileges as a corporation, or when they exercise powers not conferred by law." §1189 Burns 1914, *supra,* provides: "The information may be filed by the prosecuting attorney in the circuit court of the proper county, upon his own relation, whenever he shall deem it his duty to do so, or shall be directed by the court or other competent authority, or by any other person on his own relation, whenever he claims an interest in the office, franchise, or corporation which is the subject of the information." With the first and second clauses of §1188, *supra,* we are not concerned in this case. It has been uniformly held under them, however, that by authority of §1189, *supra,* any one claiming a personal interest in the office might bring the action on his own relation or that the prosecuting attorney might bring it on his own relation. But it has never, in any case been declared that the Attorney-General might as relator, institute an action under these clauses nor has he ever assumed the right to do so. Under the third clause it has been decided that the information against a *de facto*

corporation must be brought by the State on the relation of the prosecuting attorney. Such a case is *North* v. *State, ex rel.* (1886), 107 Ind. 356, 8 N. E. 159, where it was said: "In such a case, it is earnestly insisted by appellants' learned counsel that the existence of the corporation, and the rights of the appellants to act as such, can only be called in question, tried and determined in a suit or proceeding instituted on behalf of the State by the proper prosecuting attorney. Counsel are right, we think, in this position. * * * Upon the facts stated in each paragraph of the information, we are of the opinion that the legal existence of the turnpike company named therein could only be inquired into at the suit of the State, instituted by the proper prosecuting attorney."

But it is with the fourth clause that we are particularly concerned, the one that wholly involves public interest and under which the proceeding before us was brought. Under it the prosecuting attorney alone of those mentioned in §1189, *supra,* may file the information. The purpose is to take back what the State has granted, the life of the corporation, and in accomplishing such a purpose there can be no interest singular to one person but it is an interest common to all who constitute the State. The provisions of §1189, *supra,* therefore, exclude all who are named therein from the right to file the information under clause four except the prosecuting attorney. The statute names two interests that may be served by the remedy by all the clauses of §1188, *supra,* private and public, and provides how the remedy may be invoked by these respective interests. The public interest is to be served through the medium of the prosecuting attorney alone. As applicable to all the clauses in §1188 designating when and for what the remedy may be invoked §1189 is as if it read, either the prosecuting attorney or any other person may file the information, but any person other than the prosecuting attorney may file it only when he has an interest in the particular subject-matter

State, ex rel. v. Home Brewing Co.—182 Ind. 75.

personal to himself and distinct from that of the public generally, the prosecuting attorney to act in all cases of public concern.

Looking beyond the provisions of the civil code which directly and specifically apply to informations in *quo warranto* we find it provided in §251 Burns 1914, §251 R. S. 1881, that "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided in the next section." The next section (§252 Burns 1914, §252 R. S. 1881) provides that "An executor, administrator, a trustee of an express trust, or *a person expressly authorized by statute may sue*", etc. Here then so far as it may be said to be influential at all is emphasis of the fact that the prosecuting attorney alone, under the code, is authorized to file informations in behalf of the State to forfeit corporate charters. In 1821 the legislature by special act authorized the governor to appoint an agent to proceed in *quo warranto* in the name of the State against the State Bank for a violation of its charter. *State Bank* v. *State* (1823), 1 Blackf. 267, 12 Am. Dec. 234. But this sole duty has been given into the hands of the prosecuting attorney by all of the express general statutory provisions enacted by the State from the beginning of such legislation to the sections now under consideration. Laws 1820 p. 153, §3; R. S. 1831 p. 368, §3; R. S. 1838 p. 407, §7; R. S. 1843 p. 935, §46; 2 R. S. 1852 p. 198, §§749, 750; §§1131, 1132 R. S. 1881. And under such provisions, prosecuting attorneys have, without question as to their undivided authority, exercised the sole and exclusive right to exhibit informations in *quo warranto* where public rights were involved. *Eaton* v. *State, ex rel.* (1844), 7 Blackf. 65; *Danville, etc., R. Co.* v. *State, ex rel., supra; State, ex rel.* v. *Smith* (1869), 32 Ind. 213; *Reynolds* v. *State, ex rel., supra; State, ex rel.* v. *Portland, etc., Oil Co.* (1899), 153 Ind. 483, 53 N. E. 1089, 53 L. R. A. 413, 74 Am. St. 314; *Logan* v. *Vernon, etc., R. Co., supra; Eel River R. Co.* v. *State. ex rel., supra; North* v. *State, ex rel.* (1886),

107 Ind. 356, 8 N. E. 159; *State, ex rel.* v. *French Lick Springs Hotel Co., supra.* If then there is a divided duty and the Attorney-General equally with the prosecuting attorney, may institute such actions for the State on his own relation, we must look elsewhere for the authority. And it is claimed by the Attorney-General that this designation of the prosecuting attorney is not exclusive, and does not exhaust the authority to exhibit informations in behalf of the State to redress public grievances committed by corporations and violative of their charters and to forfeit and recover corporate franchises to the State, for the reason that such authority belonged to the Attorney-General at common law and now attaches to the office in this State by reason of the adoption of the common law, and, therefore, the authority is as much that of the Attorney-General as the chief law officer of the State, as it is of the prosecuting attorney.

Prosecuting attorneys are the historic law officers of the State. As early as 1824 they were appointed by the governor and the duty placed on them "to prosecute all pleas, plaints, indictments, presentments and suits of every description on the part of the state." R. S. 1824 p. 127, §10. In 1831 their duties as fixed by statutory law were not materially different, but they were chosen by joint ballot of the senate and house of representatives. R. S. 1831 p. 88, §1. Thus the law continued until 1843 when provision was made for their election by the people. R. S. 1843 p. 100, §28, p. 1020, §1. By §11, article 7 of the present Constitution they were made elective constitutional officers. On the other hand the office of Attorney-General is not and has never been in this State, a constitutional office. It did not exist by authority of any provision of the law, constitutional or statutory, until 1855 when it was created, with narrowly limited powers, by an act entitled "An Act to provide for the election, fixing the compensation, and *prescribing* the duties of Attorney-General of the State of Indiana." The duties defined were limited to

provisions that he should, when required to do so, furnish certain written opinions to State officers and either branch of the General Assembly; and to "prosecute and defend all suits that may be instituted by or against the State of Indiana, *the prosecuting or defending of which is not already provided by law,*" when notified of the pendency thereof by the clerk of the court in which the suit was pending and whenever required by the Governor or a majority of State officers in writing. Acts 1855 p. 16. At the special session of the General Assembly in 1861 the act of 1855, *supra,* was amended by adding to the duties of the Attorney-General, those of prosecuting and defending all criminal or State prosecutions in the Supreme Court. Acts 1861 (s. s.) p. 14. Again the statute was amended or changed and added to by supplemental act in 1873. The code then in force, in that part of it relating to informations, authorized the prosecuting attorney to file information to recover property forfeited or escheated to the State as it had since 1852 and as it does now. 2 R. S. 1852 p. 200, §761, 2 G. & H. 325, §761, 2 R. S. 1876 p. 301, §761, §1143 R. S. 1881, §1200 Burns 1914. By the amendatory or supplemental act of 1873 the Attorney-General was placed under a duty to "institute or cause to be instituted and prosecuted all necessary proceedings to compel the payment or recovery" of forfeited or escheated property "in all cases where the officers whose duty it shall be * * * shall fail, neglect or refuse to sue for and proceed to recover" such property. Acts 1873 p. 20, §9. Under the general tax law of 1881 the Attorney-General was expressly empowered to institute actions in the name of the State on the relation of the Auditor of State and on his own relation to recover penalties from certain public service corporations for a failure on their part to comply with certain provisions of that law. Acts 1881 pp. 637-645, §§84, 85, 86, 87, 102, §§6352, 6353, 6354, 6355, 6370 R. S. 1881. By §§10 and 16 of an act approved March 9, 1883 (Acts 1883 p. 203, §10) the Attorney-

General was, under certain circumstances, upon the report of the facts to him by the Auditor of State, expressly authorized to bring proceedings in *quo warranto* against certain life insurance companies to oust their officers and to revoke the license granted to such companies to do business in the State. And in 1901 a similar act was passed relating to voluntary associations organized under the laws of this State. Acts 1901 p. 289, §29, §4595p Burns 1901. In 1885 the act of 1873 was amended but not in any particular affecting the question before us. Acts 1885 p. 192. In 1889 a comprehensive act was passed embodying the preceding laws, creating the office of Attorney-General and bestowing on the office the same limited general powers herein before noted but not enlarging them. Acts 1889 p. 124, §§9266-9269 Burns 1914. This act still retains the provision that "Such attorney-general shall prosecute and defend all suits that may be instituted by or against the state of Indiana, the prosecution and defense of which is not otherwise provided for by law", and it was, when this action was brought, and now is, in force. §9269 Burns 1914, Acts 1889 p. 124. At the same session the legislature invested the Superior Court of Marion County with jurisdiction as a court of claims to hear and determine claims against the State and by §4 of the act made it the duty of the Attorney-General to represent the State in such cases there and in the Supreme Court. Acts 1889 p. 265. In 1893 provision was made for suits on bonds of foreign building associations by the State on the relation of the Attorney-General. Acts 1893 p. 274, §3. By the act of 1895 (Acts 1895 p. 202) upon report of the facts to him by the auditor of State the Attorney-General was specifically directed to "institute such legal proceedings as shall be proper" to wind up certain defaulting bank corporations. By joint resolution of 1873 (Acts 1873 p. 245, §5672 R. S. 1881, §7701 Burns 1901), and by act of 1897 (Acts 1897 p. 145) he was given certain authority in the matter of the claims of the State against the Vandalia

Railroad. In a few other instances duties have been placed on the Attorney-General from time to time which bear little or no relation to the question before us. See note to §9269 Burns 1914. By an act passed in 1899, designated in the title as an act supplemental to the civil code, which act is still in force and was when the action before us was brought (Acts 1899 p. 219, §9270 Burns 1914) it was provided as follows: "That the Attorney-General shall have charge of and prosecute all civil actions which shall hereafter be brought, either in the name of the state of Indiana, or in the name of the state of Indiana on the relation of the attorney-general or on the relation of any state board created by general law; and any such action may be brought or prosecuted by said attorney-general in person or by deputy and assistant only, and any relief to which the state is or shall be entitled in any civil action may therein be obtained without filing any bond either for costs or damages. *Provided,* That nothing herein shall be taken to affect the authority now given by law to prosecuting attorneys to prosecute civil actions."

In this State the courts have plenary judicial power but the Constitution itself provides that "the judicial power of the state shall be vested in a supreme court, in circuit courts and in such other courts as the General Assembly may establish", and as has been said, "the people thus gave the courts all the judicial power they had to give." The legislative department, in like manner, is given "the legislative authority of the State", subject, of course, to the constitutional limitations. But under article 6 of the Constitution, which deals with administrative offi cials, the Constitution forbears to grant them such a comprehensive delegation of power. This rule of delegated power prevails generally in the United States. It is doubtless true that in some of the states the constitutional delegation of power, to administrative officers has been general. This policy is to create certain officers by the Constitution

and leave their powers to be defined by the court. In such cases, if the office were one that existed at common law, there would doubtless be imputed to it the common-law powers not inconsistent with the general State government, and even if not a common-law office but simply one that had existed prior to the adoption of the Constitution, the courts would impute to it the functions it had historically exercised. 29 Cyc. 1431. Some of the decisions cited by the Attorney-General from other states involve this distinction. But the plain policy of Indiana as shown by its Constitution, its legislative enactments and its judicial decisions, is that administrative officers shall be held to the rule of delegated power. The statutes are filled with the details of official duty. Sheriffs, constables, coroners, justices of the peace—all these find their powers prescribed by our statutes. The Attorney-General has cited *Doering* v. *State* (1874), 49 Ind. 56, 19 Am. Rep. 669, in which the question was involved of the powers of an Evansville policeman. The court simply held that the Evansville common council had power "to establish, organize, and maintain a city watch, and to prescribe the duties thereof, and to regulate the general police of the city. The ordinances of the city defining the duties and prescribing the powers of the police force, were not read in evidence. * * * It was proved that the appellant was acting as a policeman in such city. We think we should indulge the presumption, that the police force of such city possesses the ordinary powers of the peace officers at common law." In other words the court did not hold that by calling the individual a policeman, that gave him certain powers, but assumed that the city council, acting under its authority, had defined his powers along constabulary lines.

Over and over again this court has held that public officers in Indiana exercise but delegated powers—"naked powers" they have been called. Even constitutional officers have been held to this rule of delegated powers. *Bran-*

*ham* v. *Lange* (1861), 16 Ind. 497; *Marlock* v. *Strange* (1856), 8 Ind. 57. The last above case deals with the justice of peace, who was a common-law official and who is a constitutional officer. The Attorney-General undertakes to meet this case by saying that the question involved was one of civil jurisdiction and that justices of the peace had no civil jurisdiction at common law. But the same doctrine was applied to the justice of peace where his authority in criminal cases was in question. *Wakefield* v. *State* (1854), 5 Ind. 195; *Hawkins* v. *State, ex rel.* (1865), 24 Ind. 288; *State* v. *Morgan* (1878), 62 Ind. 35, 39. A number of other cases are cited in appellant's brief where officers have been held to "delegated power", with the insistence that they refer to officers that had no existence at the common law. That is, indeed, true in the cases referred to, but the distinction has never been noted by the court. The decisions of this court have always indicated a strict adherence to the rule that public officers exercise only delegated authority. In addition to the cases cited above, see *Jones* v. *Cavins* (1853), 4 Ind. 305; *Lund* v. *Board, etc.,* (1911), 47 Ind. App. 175, 93 N. E. 179; *Platter* v. *Board, etc.* (1885), 103 Ind. 360, 378, 2 N. E. 544, and cases there cited; *Sherrick* v. *State* (1906), 167 Ind. 345, 79 N. E. 193; *Daily* v. *State, ex rel.* (1909), 171 Ind. 646, 87 N. E. 4. In the two cases last cited the doctrine of delegated authority was applied to the office of Auditor of State, a constitutional officer. In *Daily* v. *State, ex rel., supra,* 652, it was said: " 'The legislature must prescribe all the duties the Auditor of State will be permitted to exercise.' His duties and powers, except such only as are necessarily implied to enable him to render obedience to some express command of the General Assembly, are expressed, defined and given publicity by and through the public laws of the State".

This rule, that under our system of government public officers have and exercise a naked statutory authority and have no powers other than such as are so expressly or im-

pliedly granted, has been specifically applied to the
6.   statutory office of Attorney-General.   In *Julian* v.
*State* (1890), 122 Ind. 68, 23 N. E. 690, it was said on
page 72:   "It is a well settled doctrine that officers of the
State exercise but delegated power, and this is particularly
true of the attorney general.   His office is created by stat-
ute, and he, as such officer, can only exercise such power as
is delegated to him by the statute."   This declaration was
approved and followed in *Julian* v. *State* (1895), 140 Ind.
581, 584, 39 N. E. 923, and *Hord* v. *State* (1907), 167 Ind.
622, 79 N. E. 916 both of which cases involve the office of
Attorney-General.   The Attorney-General is not a consti-
tutional officer and cannot have any of the powers that
would come to such an office from the common law under the
rule above noted, by which constitutional officers in some
jurisdictions are held to have common-law powers.   He is
a creature of the statute and the statute which created the
office prescribed his duties.   The title of the act creating
the office designates it as "An act to provide for the elec-
tion, fixing the compensation and prescribing the duties of
the Attorney-General of the state of Indiana."   If the legis-
lature had intended that the Attorney-General should have
the duties of the common-law officer of that name, it would
not have prescribed his duties.   The word "prescribe" has
a very definite and a very limited meaning.   Etymologically,
it means to write before.   It means to set down authority, to
dictate, to impose as a peremptory order.   If an officer's
duties are dictated by the statute creating the office and if
they are written down beforehand, it is difficult to see how
his authority can go beyond the statute creating the office
and other statutes adding expressly to the duties of it.   If
the legislature had intended that he should have any duties
other than those prescribed, it would have definitely fixed
what his duties were to be.   The powers and duties of the
Attorney-General, under the common law, have always been
well understood and if it had been the intent of the legis-

lature that he should have those duties, it would have said so and would have added thereto such other duties and powers as it might have desired him to exercise. No general common-law authority can be raised by implication from any of the enactments. Such powers as he possesses have been slowly doled out to him from time to time by express legislative provision as occasion seemed to demand his services for the growing demands of the State. The fact that he is called the Attorney-General in the statute, gives him no duties. We must, therefore, look to the statute to ascertain his duties. Suppose he had been called the State's attorney or the Governor's counsel. It could not then be contended he could institute *quo warranto* proceedings such as these. Being called Attorney-General, with his duties prescribed, he is equivalent to a newly-created officer and we can seek for a definition of his powers only in the statute creating the office. Some powers may be incidental to that expressly delegated to the office but the incidental power must arise out of the nature of the express grant, in the necessity of its exercise, and for the accomplishment of its purpose. And to such incidental powers, or even the manner of discharging the particular duty, that, doubtless, may be determined in a proper case, from a consideration of the common law, for the courts may go to that body of common law as to history to learn a fact or as to a lexicon to find a definition. But they may not so journey away from the statutes to find the power itself for a statutory officer.

The supreme court of Washington followed the declaration of this court, that the office of Attorney-General was not the repository of any common-law powers and applied it in denial of a claim of the Attorney-General of that State, that he was invested with the common-law right to exhibit informations in the nature of *quo warranto* involving public interests. In that state both the prosecuting attorney and the Attorney-General are constitutional officers. *State, ex. rel. v. Seattle Gas Co.* (1902), 28 Wash. 488, 68 Pac. 946, 70 Pac.

114; *State, ex rel.* v. *Point Roberts, etc., Co.* (1906), 42 Wash. 409, 412, 85 Pac. 22; see, also, *Atchison, etc., R. Co.* v. *People, ex rel., supra.*

It is evident that the Attorney-General gathers no authority from the common law which will serve to divide with the prosecuting attorney the right and the duty to institute *quo warranto* proceedings to forfeit corporate charters. And the remaining inquiry is whether any provision of the statute does so. Reliance is placed by the Attorney-General on the provisions of the act of 1899, §9270, *supra,* which is set out above, for this statutory authority. Now, as we have seen, it has been the legislative policy since 1820 to give into the hands of the prosecuting attorney alone, the authority and duty of prosecuting informations in *quo warranto* in cases involving public interest only. And a change of such legislative policy we would expect to find, when made, couched in clear and unequivocal language. The fact that the authority of the prosecuting attorney has been so long undivided in the particular before us is emphasized by the application of the old maxim of the law "The express mention of one person or thing is the exclusion of another". Wharton, Legal Maxims 11. Or otherwise stated, "What is expressed makes what is silent to cease". Coke, Litt. 210a. *Woodford* v. *Hamilton* (1894), 139 Ind. 481, 39 N. E. 47. "When the law is in the affirmative that a thing should be done by certain persons or in a certain manner, this affirmative matter contains a negative that it shall not be done by other persons or in another manner". 26 Am. and Eng. Ency. Law (2d ed.) 605, and cases there cited. We may not, therefore, annex to the office of Attorney-General a part of the authority which has so long rested with the prosecuting attorney without express statutory authority so to do. There is in the act of 1899, *supra,* no express grant of authority to the Attorney-General to file an information in *quo warranto* to serve the public interest of the State on his own relation; and if the lan-

guage used would otherwise permit the implication that the Attorney-General might, under the act, equally, with the prosecuting attorney, institute such an action, the proviso would positively negative the rest of the act in this particular and preserve the undivided authority in the hands of the prosecuting attorney where it has so long been. The office of a proviso in a statute is generally, either to except something from the enacting clause, or to qualify or to restrain its generality. *Simpson* v. *State, ex rel.* (1913), 179 Ind. 196, 99 N. E. 980. But its purpose is, sometimes, to exclude some possible ground of misinterpretation of the body of the section or act, as to extending it to cases not intended by the legislature to be brought within its purview. 26 Am. and Eng. Ency. Law (2d ed.) 678; 36 Cyc. 1162. The proviso in the act of 1899, *supra,* may, manifestly, be taken to be used for both purposes. It has no meaning and serves no purpose unless it is to keep the Attorney-General's hands off those cases which the law has intrusted to the prosecuting attorney. If it were intended to give the Attorney-General equal or concurrent authority with the prosecuting attorney to file *quo warranto* informations, it would have been easy to say and a clear and express grant would be expected. Nor would the proviso be needed merely to reserve the prosecuting attorney's right in the matter if the Attorney-General is given only a similar or concurrent authority. This proviso does not say that the prosecuting attorney should not be deprived of his authority,—it says that his authority should not be affected. For at least eighty-five years this has been in statute and practice, the province of the prosecuting attorney. His has been the official duty and discretion in the matter. If this be a civil action then an information in *quo warranto* was included in and intended by this proviso under which the prosecuting attorney had "authority given by law." He had that authority and it involved his discretion,—his official control of such cases. This act was in no

wise to affect that authority,—that is, his authority was not to be impinged, or touched upon. It is difficult to conceive of a more determinative phrase: "to affect" is have an effect on, to touch, influence, or modify; "authority" means control over, jurisdiction, absolute power.

Can the Attorney-General determine when such an information shall be filed—file it—control its issues—decide whether it shall be dismissed, prosecuted or appealed—can he take control of the whole subject-matter of such a suit, and it still be said that the "authority now given by law to the prosecuting attorney" has not been affected? Can the discretion be shared and the authority be divided without affecting it? The proposition is so obvious that a clash in court between these officials would not make it more manifest. If this statute makes any contribution to our inquiry as to the proper official relator in *quo warranto* information, that contribution must be this—this statute recognizes and reserves to the prosecuting attorney his right to file, and his authority and discretion in filing, such informations in *quo warranto*.

In this day of many corporations, dealing with many interests which affect the people of the State closely, there has come a greater activity of the State in making provision for their supervision and control, to keep them within their grants of powers. This supervision has mainly been delegated to administrative State officers. It would seem in such circumstances that it would be beneficial and in harmony with these changed conditions to increase the authority of the Attorney-General in the matter before us of instituting, or directing the institution, and, of prosecuting cases of the nature of that before us. But that duty lies with the legislature and not with the courts.

The court did not err in sustaining the demurrer to appellant's complaint for the reason stated and the judgment is affirmed.

Vol. 182—7

NOTE.—Reported in 105 N. E. 909. As to the adoption of the common law in the United States, see 22 L. R. A. 501. On the question of *quo warranto* as matter of right by attorney-general or district attorney, see 1 L. R. A. (N. S.) 826. As to what the "common law" includes, see Ann. Cas. 1913 E 1222. As to principles underlying modern statutes affecting *quo warranto*, see 125 Am. St. 634. See, also, under (1) 8 Cyc. 367, 369, 373; (2) 32 Cyc. 1440; (3) 32 Cyc. 1416; (4) 32 Cyc. 1427; 8 Cyc. 376; (5) 32 Cyc. 1444; (6, 8) 32 Cyc. 1441; (7) 8 Cyc. 843, 806; (9) 36 Cyc. 1161.